UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN VO, as personal representative of
LOUIS VO (deceased),

       Plaintiff,

v.

UNITED STATES OF AMERICA,

       Defendant.
_____/

CASE NO. 1:15-CV-420

HON. ROBERT J. JONKER

## OPINION

On Christmas Eve, 2013, a postal vehicle struck and killed Louis Vo as he walked across Porter Street on his way to Christmas Eve mass at Our Lady of La-Vang in Wyoming, Michigan. Plaintiff Brian Vo, as personal representative of Louis Vo, brings this action for wrongful death against Defendant United States of America. A bench trial took place, and post-trial briefing is complete.

    **1.**    **SUMMARY OF TRIAL TESTIMONY**

        **A.    Peter Vo Witnesses the Accident**

At 6:12 p.m. on December 24, 2013, Peter, who was twenty-three years old at the time, picked up his grandfather, Louis Vo, to go to Christmas Eve Mass at Our Lady of La-Vang. It was dark outside, and the weather was cold. Peter was wearing a light fall jacket and no hat or gloves. It took Peter and Louis about ten minutes to drive to the church. The church is on Porter Street, which had two eastbound lanes and two westbound lanes. When Peter and Louis arrived, the church parking lot was full, and so they parked in the lot of a business across the street from the church. It

was not unusual for members of the church to use this lot when the church lot was full. In fact, the church posted a member with a reflective vest to assist parishioners at the point of crossing.

Peter and Louis exited the car and approached Porter Street. Traffic was light. They waited for a westbound car to pass. They looked both ways. They saw the headlights of two cars coming from the east, far enough away that Peter judged it a safe distance for crossing. Peter and Louis began walking across the street. Louis was 77 years old, but he walked at least a mile every day, was in good health, and had good eyesight. He needed no assistance crossing the street.

As Peter and Louis passed over the center line of the street and into the third lane, Peter began to walk faster. He accelerated his pace because he was cold and wanted momentum crossing over a mound of snow by the curb. As he reached the side of the road, Peter heard Vy Tran (the church member at the crossing) call out for him to watch out for his grandfather. Peter turned toward the street and heard the impact. He did not see the postal truck coming until the moment he turned and heard the impact. He saw the brake lights of the postal truck but no headlights or other lights. He had crossed all four lanes without seeing the postal truck.

### B. Vy Tran Witnesses the Accident

Vy Tran, a member of Our Lady of La-Vang, was an eyewitness.[1] He testified at trial as follows. Mr. Tran was not only a member of the church, but also served the church as a parking and crossing attendant. The church has a parking lot, but when the lot is full, church attendees typically park in the building lot across the street, as Peter and Louis did. The night of the accident, Mr. Tran was wearing a reflective vest. The church lot became full by around 6:00 p.m. Mr. Tran recalls Peter Vo parking in the lot across the street from the church. He saw Peter and Louis stop and look

---

[1] Mr. Tran testified through a duly sworn Vietnamese language interpreter.

for cars before crossing the street. As Peter and Louis were about to cross the street, Mr. Tran looked for any oncoming traffic and saw none. There were no headlights in the vicinity. But when Peter and Louis were about halfway across the street, Mr. Tran saw the postal truck approaching them, and he could see they were unsafe. The postal vehicle was already too close to them.[2] Mr. Tran called out to them. He does not know if anyone heard him. Mr.Tran then saw the vehicle hit Louis. He shouted to Peter that his grandfather had been hit, and then radioed a person inside the church to call for help. Mr. Tran knows he did not see the headlights of the postal truck, but would not say unequivocally whether the lights were on or off when the accident occurred because he was not focused on the issue. He did not see brake lights or hear any braking sound coming from the postal truck before it hit Louis.

        C.        **Son Bui Witnesses the Accident**

Son Bui, an eyewitness, testified about his observations the night of the accident.[3] Mr. Bui, a member of Our Lady of La-Vang, was en route with his family to the Christmas Eve mass. He turned from Burlingame Avenue onto Porter Street, traveling westbound. The intersection of Burlingame and Porter is approximately half a mile from the church. When Mr. Bui started driving on Porter, he did not see any taillights ahead of him. When he drew close to the church area, he saw that he was driving behind the postal vehicle. He did not see any taillights as he was driving behind the postal vehicle. Both the postal vehicle and Mr. Bui's vehicle were in the far right lane, the lane closest to the church and the curb. As the vehicles neared the church, Mr. Bui started moving into

---

[2]Mr. Tran indicated the distance between the postal vehicle and Louis was approximately the same as the distance from the witness stand to the end of the jury box – less than 20 feet.

[3]Mr. Tran testified through a duly sworn Vietnamese language interpreter.

the lane to the left, so he could turn left and park in the lot across the street from the church. As his car was about halfway into the left lane, he saw the postal vehicle hit Louis Vo. Mr. Bui did not see brake lights come on or the vehicle slow down before the impact occurred. He did not see the postal vehicle's taillights at any point.

Mr. Bui spoke with police officers who came to the scene. He told the police that the taillights of the postal vehicle were not illuminated. He also provided a written statement to the police at their request. He did not mention in the written statement that the taillights off because no one asked him about it as he was preparing the statement.

### D. Mr. Wieck's Involvement

Mr. Wieck drove the postal vehicle that struck Louis Vo. Mr. Wieck joined the United States Postal Service in 1973. Mr. Wieck is a mail carrier and has served as a union steward and safety captain. He has a valid driver's license. For most of his career, Mr. Wieck has driven a "long life vehicle" to deliver the mail. He drives the same postal vehicle every time he delivers the mail. Mr. Wieck begins each workday by inspecting his postal vehicle as required. The inspection includes ensuring that the lights on the vehicle work properly. To turn on the headlights, Mr. Wieck pulls a knob out, and to turn them off, he pushes the knob back in. If the engine is not running, the lights go off automatically. The lights do not come on automatically with the engine, however. Rather, a conscious decision and action to turn on the lights is required. After inspecting the vehicle, Mr. Wieck turns off the engine, goes into the postal station to pick up the mail for delivery, loads the vehicle, and starts his route. He testified that he customarily turns on the headlights and keeps the lights on all day, regardless of the weather conditions.

On December 24, 2013, Mr. Wieck began his workday at 7:00 a.m. He inspected the vehicle

and found the lights were working properly. Mr. Wieck performed his usual mail route and returned to the postal station around 6:00 p.m. He brought his postal truck to the back dock to unload it for that day. He turned the vehicle off. He turned the lights off or they turned off automatically. He exited his vehicle and unloaded it. As Mr. Wieck was standing on the dock, the night manager, Steve Parsons, approached Mr. Wieck, and told him that he needed to collect mail from a postal box on Lee Street.

Mr. Wieck got into his postal truck and departed for Lee Street. From the postal station, he drove down Prairie Parkway to its intersection with Burlingame. He turned right onto Burlingame and traveled to the intersection with Porter, where he turned left onto Porter, proceeding west. Traffic was sparse. Mr. Wieck checked his speedometer. He was driving about 25 miles per hour on Porter. As his vehicle approached the church, he noticed some orange cones or barrels. At almost the same time, he also noticed a man about four feet away wearing a reflective vest. Mr. Wieck had not seen anyone crossing Porter as he was driving down the street toward the church. But as he was noticing the cones and the man in the reflective vest, he suddenly saw a person immediately front of him on the road, in his lane. Mr. Wieck estimates the person was about six feet away from him.[4] It appeared to Mr. Wieck that the person was not walking, but was standing and looking directly at his face. Mr. Wieck acknowledges the possibility that the person had been walking and stopped and looked at him because he was startled. Mr. Wieck slammed on the brakes and at the same time heard a thud. He saw something go over the left side of his vehicle. Mr. Wieck is not sure whether the person who was looking at him is the person his vehicle struck. Mr. Wieck

---

[4]In his deposition, Mr. Wieck testified that the person was three to six feet away. At trial, he testified that the person was closer to six feet away.

stopped his vehicle in the lane of travel, turned off the engine, and exited the vehicle.

Mr. Wieck testified that his lights were on from the time he left the postal station until he turned off the engine. He testified that the lights must have been on because no other drivers turned their lights off and on to signal to him that the lights were off, and because he was able to check his instrument panel as he was driving, even though it was dark out. The instrument panel is illuminated when the lights are on.

Upon exiting the vehicle, Mr. Wieck saw a person lying on the ground. Mr. Wieck testified that if he had exited the truck with his lights on, a buzzer would have sounded, and he did not hear a buzzer when he exited the truck. Mr. Wieck shouted for someone to call 9-1-1. He got back in his vehicle and called his supervisor, Steve Parsons. He turned on his vehicle's emergency flashers.

Police arrived at the scene and questioned Mr. Wieck. Mr. Wieck admits he made a false statement to the police officer. In particular, Mr. Wieck testified that he falsely told the police that someone had run out in front of him. Mr. Wieck testified that he made this statement because it was the only explanation he could come up with for why the person he saw immediately before impact was there. The admittedly false statement was exculpatory, and Mr. Wieck did not receive a ticket for the accident. He did not correct the false statement to the police.

Mr. Wieck remained at the accident scene for about an hour, possibly longer. When he left, he returned directly to the postal station. He recalls that Mr. Parsons drove him back to the station, where he remained for about 45 minutes. He does not recall whether he drove himself home.

### E. Steve Parsons's Testimony

Steve Parsons, who was Mr. Wieck's supervisor when the accident occurred, has worked for the USPS for about fifteen years. In December 2013, he was the closing supervisor at the Wyoming

postal station where Mr. Wieck worked. As closing supervisor, Mr. Parsons's duties included, among other things, ensuring that the mail carriers picked up mail from all the collection boxes in his zone; that all the mail was delivered for the day; and that all of the carriers returned to the station at the end of the day. He was able to determine whether collection boxes had been picked up based on whether a bar code inside each collection box had been scanned.

Mr. Parsons was working as closing supervisor on December 24, 2013. Mail volume was heavy. Mr. Parsons and the mail carriers worked longer hours that day. Mr. Parsons tells a different story than Mr. Wieck about what happened at the station. According to Mr. Parsons, he first saw Mr. Wieck return to the station around 5:30 p.m. and that he immediately sent Mr. Wieck to pick up collection boxes in the plaza across the street from the station. Mr. Parsons testified that while Mr. Wieck was gone, he ran the report to determine whether any other collection boxes had not yet been picked up. The report revealed that there were two other boxes that had not yet been collected. Mr. Parsons went back outside and waited for Mr. Wieck to return. He did so because he wanted to catch Mr. Wieck as quickly as possible, before Mr. Wieck came inside. He watched Mr. Wieck drive back to the station from the plaza across the street. It was dusk. Mr. Parsons testified that Mr. Wieck's lights were on and that he knows this because if the lights had been off, he would have noticed, as Mr. Wieck was driving directly toward him. Mr. Parsons also testified that a person in a postal vehicle with the lights on at night should be able to see ahead the distance of a city block. When Mr. Wieck reached the parking lot, Mr. Parsons directed him to pick up the mail from the Lee Street mail collection boxes.

The accident occurred while Mr. Wieck was en route to Lee Street. Mr. Wieck called Mr. Parsons and told him of the accident. Mr. Parsons called his supervisor and the postmaster of Grand

Rapids and drove to the scene. When he arrived, the police and fire departments were at the site. Mr. Wieck was standing beside the postal vehicle. Mr. Parsons did not speak to any police officers at the accident site. Mr. Parsons remembers little else about this part of the evening. He testified that he would have taken any mail from the collection boxes out of the truck. He does not recall whether Mr. Wieck had unloaded the collections from his regular route. Mr. Parsons returned to the postal station. At some point after December 24, 2013, Mr. Parsons was directed to prepare a written account of what had happened. He does not recall who told him to prepare the statement.[5]

The Court notes that Mr. Wieck and Mr. Parsons describe what happened the night of the accident differently. Mr. Wieck testified that after his regular route, he went into the postal station, turned off his truck, exited the vehicle, and unloaded the truck. Mr. Parsons testified that Mr. Wieck never turned off the vehicle or exited the vehicle before leaving to pick up the missed mail. The inconsistencies between the testimony of Mr. Wieck and Mr. Parsons cast doubt on the credibility of the testimony. In the Court's view, the written account Mr. Parsons prepared further diminishes Mr. Parsons's credibility. The written account describes the accident happening on December 24, 2014, even though the accident actually occurred in 2013. The mistaken date suggests that Mr. Parsons prepared the statement well after the accident happened and in the face of potential litigation. In his written account, Mr. Parsons emphasizes repeatedly that the headlights on Mr. Wieck's postal vehicle were illuminated: "Wieck never exited his vehicle, turned off the engines or lights while he was in the postal parking lot with me. His lights were on . . . if they were not I would

---

[5]The government offers the written statement as proposed Exhibit Y. Plaintiff objects to the written statement as inadmissible hearsay. The Court agrees the government has failed to establish a foundation for admission of the statement in support of the truth of the matter asserted. The Court admits Exhibit Y for the limited purpose of evaluating the credibility of Mr. Parsons' testimony.

have noticed and would have said something as it was well after dark. I know without any doubt that Carrier Wieck DID have his vehicle headlights ON." (Government Exhibit Y.) Mr. Parsons's written account is self-serving, and the repeated emphasis regarding the headlights being on strikes the Court as protesting too much.

### F. Officer Kesha McConaha's Testimony

Officer Kesha McConaha[6] graduated from Grand Valley State University with a bachelors degree in criminal justice in 2012, and from the Kalamazoo Valley Community College Police Academy in November of 2012. She has worked for the City of Wyoming as a police officer for approximately four years. Her duties as a police officer include road patrol and taking accident reports, among other things. She received training in responding to accidents and taking accident reports while at the Police Academy and in the course of her employment with the City of Wyoming. On December 24, 2013, Officer McConaha had been on the job at the City of Wyoming Police Department for approximately six months and had been a patrol officer for approximately a year. She had participated in the investigation of around twelve traffic accidents during that time. None of those accidents involved pedestrians, and none involved a fatality.

Officer McConaha's shift began at 3:00 p.m. on Christmas Eve 2013. At approximately 6:30 p.m., police dispatch notified her of the accident. She drove to the scene, arriving about 6:37. She testified that there were street lights hanging intermittently along Porter, lighting up the areas of the roadway immediately beneath the streetlights. She also observed a church sign that was illuminated but not bright enough to extend into the roadway. Officer McConaha was the first officer to arrive

---

[6]Officer McConaha's surname has changed since the time of the accident and is now Johnson. At trial, the parties referred to her as Officer McConaha for ease of the reference, and the Court now does the same.

at the scene. Initially she tended to Louis Vo. After that, she spoke with Peter Vo, Vy Tran, andSon Bui about what they had witnessed. She conducted verbal interviews with all three men without using an interpreter.[7] She also directed Peter, Mr. Tran, and Mr. Bui each to provide a written witness statement. Officer McConaha did not ask any of these witnesses whether any of the postal truck's lights were on when the accident occurred, and none of them volunteered information about the lights.

### E. Expert Witnesses

Plaintiff proffered Gary McDonald, a traffic accident re-constructionist, as an expert.[8] Mr. McDonald testified principally that because Michigan law requires that vehicle headlights must illuminate at least 100 feet, Mr. Wieck would have been able to see Mr. Vo in time to stop if his headlights had been illuminated. Defendant proffered Massoud Tavokoli, Ph.D., a professor of mechanical engineering with a specialization in traffic accident reconstruction, as its expert. Dr. Tavokoli's testified fundamentally that the degree to which objects are illuminated depends on numerous factors beyond the intensity of light. According to Dr. Tavokoli, consideration of the other factors shows that even if the headlights were illuminated, it would have been impossible for Mr. Wieck to see them in time to stop the postal truck.

### 2. LEGAL STANDARDS – FTCA AND WRONGFUL DEATH

---

[7]The Court notes that during trial, a Vietnamese translator was essential for Vy Tran and Son Bui, though not necessary for Peter Vo.

[8]Defendant challenges Mr. McDonald's qualifications and methodology. The Court finds it unnecessary to evaluate these issues based on its conclusion that the headlights were not illuminated. Mr. McDonald's expert testimony would be rebuttal to Defendant's expert only if the Court concluded that the lights were on. Because the lights were not on, the McDonald testimony is not essential.

Under the FTCA, a plaintiff may recover monetary damages from the United States for injury, property loss, or death "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope . . . of employment." 28 U.S.C. § 1346(b). The law of the place where the act or omission occurred governs the legal claim. *Id.* The Michigan Wrongful Death Act provides:

> (1) Whenever the death of a person, injuries resulting in death, or death as described in section 2922a shall be caused by wrongful act, neglect, or fault of another, and the act, neglect, or fault is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages, the person who or the corporation that would have been liable, if death had not ensued, shall be liable to an action for damages . . . ."

MICH. COMP. L. § 600.2922(1). There are three elements of a wrongful death action under Michigan law: (1) that there be a death; (2) that the death "be caused by wrongful act, neglect, or fault of another. . . .;" and (3) that the "wrongful act, neglect, or fault of another" be such that, if death had not ensued, a cause of action could have been brought against the responsible party and damages recovered. *Simpson v. Alex Pickens, Jr., & Associates, MD, PC*, 311 Mich. App. 127, 136, 874 N.W.2d 359 (2015).

"[T]he wrongful-death act is essentially a 'filter' through which the underlying claim may proceed." *Wesche v. Mecosta Co. Rd. Comm.*, 480 Mich. 75, 88, 746 N.W. 2d 847 (2008). The underlying claim here is common law negligence. "Generally, negligence is conduct involving an unreasonable risk of harm." *Schultz v. Consumers Power Co.*, 443 Mich. 445, 449, 506 N.W.2d 175 (1993). A negligence claim requires "that the defendant owed a legal duty to the plaintiff, that the defendant breached or violated the legal duty, that the plaintiff suffered damages, and that the breach was a proximate cause of the damages suffered." *Id.*

In a wrongful death action under the FTCA and Michigan law, the plaintiff bears the burden of proving liability by a preponderance of the evidence. *See, e.g., Price v. United States*, 728 F.2d 385 (6th Cir. 1984).

3.     **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In the Court's view the key factual issue is whether the postal truck had headlights on before the accident. It was dark at the time, and failure to have the lights on would amount to negligence as a matter of law. Moreover, the failure to have the lights on would eliminate any potential comparative fault by the victim for crossing the street where and when he did because without headlights on, the truck would not have been visible to a crossing pedestrian until the truck was literally upon him – namely, within the 3 - 6 foot range that the postal driver himself says was all the space in which he – and therefore the pedestrian – had time to react.

A preponderance of the evidence establishes that the headlights of the postal vehicle were not illuminated when the accident occurred, and the Court so finds as a matter of fact. The only reasonable explanation consistent with the great weight of the evidence, including Mr. Wieck's own testimony, is that the headlights were off. No one testified that they saw the truck's headlights on at the time. Peter Vo and Vy Tran each testified credibly that he did not see the postal vehicle approaching.[9] Son Bui, who was following the postal vehicle, did not see the truck's taillights on, nor did he notice headlight illumination as he pulled into the left lane just before the accident. The lights of the truck were also off after the accident.

---

[9]Peter testified that he saw two vehicles in the far distance, approximately a third of a mile away, which is farther away than the postal vehicle would have been to strike Louis Vo when it did, particularly in light of Mr. Wieck's testimony that he was driving approximately 25 miles per hour.

12

Moreover, the absence of the headlight illumination also best explains the other evidence. Had the lights been on, Mr. Wieck would have seen the reflective barrels and vests earlier. He would also have seen Louis Vo before the 3 - 6 feet range. And Mr. Vo would have seen him in time to stop before impact. Mr. Wieck says the object – Mr. Vo's body – went over the left side of the truck, which means that all Mr. Vo had to do was take one step back to avoid impact, had he been able to see illuminated headlamps.

The government's theory to the contrary rests principally on the testimony of Mr. Weick and Mr. Parsons, but their testimony is not credible. Mr. Wieck admits he lied to police the night of the accident about seeing someone run in front of him. He did not retract that until this litigation. There is little reason to believe he was truthful about other aspects of the accident. Mr. Parsons is no help either. Mr. Parsons and Mr. Wieck have fundamentally inconsistent stories about what happened at the postal station before Mr. Wieck left to pick up the missed boxes. The mistaken date and excessive emphasis on the headlights in the written statement Mr. Parsons belatedly prepared suggests he was really trying to protect Mr. Wieck and the Post Office, not recount a truthful and complete narrative of events.

The Court also discounts Officer McConaha's descriptions of her interviews with Vy Tran and Son Bui. She did not use a Vietnamese interpreter for the interviews, and it was clearly evident at trial that an interpreter was essential to their ability to understand and answer questions. She did not ask either of them, or Peter Vo, whether the postal vehicle lights were on. She had training but little experience in taking witness statements at accident scenes, and she had never taken witness statements about an accident involving a fatality. For all that, it is worth noting that nothing in the witness statements of Peter, Mr. Bui, and Mr. Tran was inconsistent with their testimony, which

13

further bolsters their credibility. It is simply the officer's conclusion about the accident that the Court discounts.[10]

For all of these reasons, the Court finds by a preponderance of the evidence and as a matter of fact that the headlights on the postal vehicle that struck Louis Vo were not illuminated when the accident occurred. The Court further finds as a matter of fact that the failure to illuminate the headlights proximately caused the death of Louis Vo.

The Court's factual finding regarding the headlights dictates a legal conclusion that the U.S. Postal Service, as Mr. Wieck's employer, is liable under Michigan's wrongful death act. No one disputes that drivers owe a legal duty to drive with reasonable prudence. No one disputes that failing to turn on headlights after dark breaches that duty. The failure to turn on the headlights proximately caused a fatality. All the elements of negligence and wrongful death are present. The Court concludes as a matter of law that the U.S. Postal Service is liable for the wrongful death of Louis Vo.

### 4. PERCENTAGE OF FAULT

MICH. COMP. L. 600.2957 provides that "[i]n an action based on tort or another legal theory seeking damages for . . . wrongful death, the liability of each person shall be allocated under this section by the trier of fact and, subject to section 6304, in direct proportion to the person's percentage of fault."

MICH. COMP. L. 600.6304 provides that:

[i]n an action based on tort or another legal theory seeking damages for . . . wrongful death involving fault of more than 1 person, including third-party defendants and non-parties, the court . . . shall make findings indicating both . . . [t]he total amount of each plaintiff's damages [and] [t]he percentage of the total fault of all persons that

---

[10]Of course, the officer's mistaken conclusion also rested, in part, on Mr. Wieck's admitted lie to her about what happened.

contributed to the death or injury, including each plaintiff and each person released from liability under section 2925d, regardless of whether the person was or could have been named as a party to the action.

In making this determination, the trier of fact "shall consider both the nature of the conduct of each person at fault and the extent of the causal relation between the conduct and the damages claimed." MICH. COMP. L. 600.6304.[11]

A pedestrian crossing a street must "exercise that degree of care and caution which an ordinary careful and prudent person would exercise under like circumstances." *Yeary v. United States*, 744 F.Supp. 546, 549 (E.D. Mich. 1991) (citing *Malone v. Vinning*, 21 N.W. 2d 144, 146 (Mich. 1946)). The government contends that Peter Vo and Louis Vo were at least partially at fault and should be assigned a portion of liability for the accident. The government emphasizes that Peter and Louis did not cross at a crosswalk and that they were wearing dark clothes, which made it more difficult to see them in the dark. The government notes that Michigan's Uniform Traffic Code requires pedestrians to cross the street at marked crosswalks. MICH. UNIF. TRAFFIC CODE §§ 7.09, 7.10. In Michigan, the violation of an ordinance is evidence of negligence. *Yeary*, 744 F. Supp. at 550.

The Court rejects the government's position. The evidence establishes by a preponderance

---

[11]Plaintiff contends that the Court may not consider any alleged comparative negligence on the part of Peter Vo, because the United States did not serve a notice of non-party fault under Michigan Court Rule 2.112. (ECF No. 97, PageID.592.) The Court disagrees. Defendant correctly notes that Plaintiff had ample notice of Defendant's contention that Peter was at fault. Plaintiff was on notice from early in the case that the government was asserting negligence by Peter as a defense. (ECF No. 17, PageID.46, Ex. A.) Indeed, Peter was a party in the consolidated case arising out of the accident, Case No. 1:15-cv-1333. (ECF No. 48.) Any failure to file a notice of non-party fault regarding Peter's alleged comparative negligence has not prejudiced Plaintiff in any way. The Court rejects Plaintiff's argument that it may not consider Peter's alleged comparative fault.

that the area where Peter and Louis crossed Porter Street was the functional equivalent of a crosswalk while the church was conducting services. A guard was present, wearing a reflective vest, and orange reflective barrels marked the area. All of this failed to prevent the accident for the simple reason that the headlights were not illuminated. The preponderance of the evidence establishes the absence of any comparative negligence on the part of Peter or Louis Vo.

5. **DAMAGES**

Under Michigan's Wrongful Death Act, a court or jury

> may award damages as the court or jury shall consider fair and equitable, under all the circumstances including reasonable medical, hospital, funeral, and burial expenses for which the estate is liable; reasonable compensation for the pain and suffering while conscious, undergone by the deceased during the period intervening between the time of injury and death; and damages for the loss of financial support and the loss of the society and companionship of the deceased.

MICH. COMP. L. 600.2922(6). *Id.*[12]

Plaintiff seeks damages for reasonable funeral and burial expenses in the amount of $7,517.00. (ECF No. 92, PageID.437); damages for the loss of financial support in the amount of $29,400.00 (*Id.*, PageId.437-38); and damages of up to $7,000,000.00 for loss of society and companionship of the deceased (*Id.*, PageID.447.)[13] The parties disagree principally regarding calculation of damages for loss of society and companionship. Defendant does not propose a particular amount, but asks that if the Court reaches the damages issue it take into consideration

---

[12] MICH. COMP. L. 600.2957 provides that "[i]n an action based on tort or another legal theory seeking damages for . . . wrongful death, the court shall reduce the damages by the percentage of comparative fault of the person upon whose injury or death the damages are based as provided in section 6306." Because the Court finds that Louis Vo bears no fault, there is no need for any reduction under the statute.

[13] Plaintiff does not seek any damages for pain and suffering while conscious.

Louis's age, which was 77 at the time of his death.

Damages for loss of society and companionship under Michigan's wrongful death act compensate survivors "for the destruction of family relationships that result when one family member dies." *McTaggert v. Lindsey*, 202 Mich. App. 612, 616, 509 N.W. 2d 881 (1993) (citing *Crystal v. Hubbard*, 414 Mich. 297, 326, 324 N.W.2d 869 (1982)). Michigan courts observe that "[t]he only reasonable means of measuring the actual destruction caused is to assess the type of relationship the decedent had with the claimant in terms of objective behavior as indicated by the time and activity shared and the overall characteristics of the relationship." *McTaggart*, 202 Mich. App. at 616, 509 N.W. 2d 881.

Brian Vo testified about Louis's background and family relationships as follows. Louis Vo was born and grew up in Vietnam. As a young adult, he joined the South Vietnamese Army. He got married and had three children – a son, Brian, and two daughters. As a member of the South Vietnamese Army, he fought against the communist North. When the North Vietnamese Army took control, Louis Vo and his wife and children fled in different directions, their lives in jeopardy. Louis eventually escaped the country by boat with other refugees, arriving in Indonesia after about six weeks at sea. Mrs. Vo was imprisoned for a time due to her association with Louis Vo. Brian escaped the country in 1978 on a small boat with 99 other refugees, arriving in Malaysia after weeks at sea without food. Brian spent two months in the hospital in Malaysia. After that, Brian emigrated to the United States with the sponsorship of a U.S. serviceman, and he completed high school in Michigan. Meanwhile, unbeknownst to his family, and unaware of what had become of Brian, Louis emigrated to the United States with the assistance of a sponsor from Florida. Louis became a United States citizen.

Brian searched for his family with the assistance of the Red Cross. When Brian was almost 25 years old, the Red Cross located Louis Vo and notified Brian – at 3:00 in the morning – that his father was in Florida. Brian called his father immediately. Brian asked him to move to Michigan and live with him. Brian sent Louis a plane ticket; picked him up at the airport; and Louis moved into Brian's residence. He lived with Brian from that point until a few months before his death, when he moved out temporarily during construction of the Vo family's new home.

Brian got married about a year after locating Louis. He and his wife had two children, Peter and Christine. When Peter was about three years old, and Christine about one year old, Brian and his wife divorced, and Brian took full custody of the children. Louis became the children's full-time caregiver while Brian worked. Louis was like a parent to Peter and Christine. Eventually, Brian re-married, and his new wife moved in with Brian and Louis. Brian and his wife were expecting a baby due around Christmas 2013. The family anticipated that Louis would care for the child while Brian and his wife worked outside the home, just as Louis had cared for Peter and Christine.

Within a few years of finding Louis, Brian also located his mother – Louis's wife – and one of his sisters – Louis's daughter – with the assistance of the Red Cross. Both were still in Vietnam.[14] At first, Brian and Louis communicated with their family in Vietnam through written correspondence, due to limitations on available technology. As the internet became available, they began talking on the phone and eventually using technology that allowed them to see each other while they were talking. They communicated this way almost every day. Mrs. Vo sought twice to leave Vietnam and come to the United States, but she was unable to obtain travel authorization to do so. Louis Vo sent approximately $200 - $300 on at least a monthly basis to his wife and daughter

---

[14]Brian continues to search for his other sister.

in Vietnam.

Brian Vo and his wife did not go to the Christmas Eve service at the church the night of Louis's death, due to the imminent arrival of their baby. Peter Vo called Brian soon after Louis was struck. Brian immediately drove to the church. He saw his father's body on the curb, where it remained for several hours. Brian spent the next few hours at the church, while officers investigated and interviewed witnesses. Peter could not talk because he was crying so much. Brian cried as well. Brian could not bring himself to tell his mother and sister that Louis had died for two months after the accident occurred.

Brian testified that Peter is not like he was before the accident. Brian has even found Peter talking to a picture of Louis. Peter himself testified that he has had insomnia and flashbacks since the accident occurred. Brian feels sad for Peter, and he asked Peter to move back into the family home so that Brian can tend to him. Peter has received counseling. Brian also feels a strong sense of grief and shock that his father died in the manner he did.

Mr. Vo's survivors include his wife and daughter in Vietnam; Brian Vo; Peter Vo; Christine Vo; and Justin Vo. The factors the Court must consider in crafting a damages award point in different directions. Louis Vo's age of 77 and life expectancy of approximately ten years suggest an award on the lower side. His connection with his wife and daughter in Vietnam was attenuated geographically. Like Brian, Peter and Christine were adults by the time Louis died. The baby born soon after Louis's death, Justin Vo, never had an opportunity to meet Louis. All of these factors point toward a lower award. On the other hand, the remarkable family story suggests a higher award. For the father and son to flee Vietnam independently and reunite years later in the United States with a middle-of-the-night phone call is truly heartwarming. With Mr. Vo's wife and daughter in

19

Vietnam there was hope of a reunion on all sides; frequent – almost daily – contact by phone; and regular financial support. That Brian Vo avoided telling them of his father's death for two months bespeaks an ongoing deep connection as well as the painfulness of the loss. A powerful bond with Louis was clear in both Peter and Brian's testimony. Louis Vo functioned like a parent for Peter and Christine. Mr. Vo lived with Brian Vo and his family from the time Brian was 25 until a few months before his death decades later. The years Brian and Louis spent apart also magnify the loss Brian experienced upon Louis's death.

Balancing all of these factors, the Court finds damages of $7,517.00 for reasonable funeral and burial expenses; $21,000.00 for loss of financial support; and $1,200,000.00 for loss of society and companionship appropriate. The Court invites Plaintiff to submit a motion for authority to distribute proceeds no later than **January 15, 2018**. MICH. COMP. L. 600.2922(6)(a). The Court will schedule a hearing promptly thereafter. *Id.*

Date: December 21, 2017 /s/ Robert J. Jonker
ROBERT J. JONKER
CHIEF UNITED STATES DISTRICT JUDGE